IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TYLER MEAD,                                         No. 3:19-cv-00966-HZ

                    Plaintiff,                      OPINION & ORDER

        v.

AARON TURNAGE; LARRY
FOULKE; each sued in their individual
and official capacities,

                    Defendants.

Erik Eklund
Law Office of Erik E. Eklund
333 SW Taylor Street, Suite 300
Portland, OR 97204

        Attorney for Plaintiff

Elizabeth Jones
Gerald Warren
Law Office of Gerald L. Warren
901 Capitol Street NE
Salem, OR 97301

        Attorneys for Defendants

1 – OPINION & ORDER

HERNÁNDEZ, District Judge:

Plaintiff brought this action under 42 U.S.C. § 1983 against Defendants in their individual and official capacities. Plaintiff alleged that Defendants violated his Fourth Amendment and Fourteenth Amendment rights. During briefing on this motion, Plaintiff voluntarily dismissed his Fourteenth Amendment claim. He also dismissed his claim that the Oregon statute under which he was charged as an adult is unconstitutional. Defendants move for summary judgment on Plaintiff's remaining Fourth Amendment claim, which alleges that Defendants did not have probable cause to arrest him and filed a knowingly false probable cause affidavit. The Court grants Defendants' motion.

## BACKGROUND

On June 19, 2017, Gresham Police received a report of a gunshot near Gresham Elementary School at about 11:32 p.m. Warren Decl. Ex. 2 at 1, ECF 34-1. On arrival, police found a car crashed into the school and observed that the driver was deceased with a gunshot wound to his face. *Id*. A K-9 officer used a canine which tracked a scent from the car to the garage door of Plaintiff's house, and the officer found Plaintiff at his house. Turnage Decl. ¶ 2, ECF 30.

Defendant Turnage and Defendant Foulke, Detectives with the City of Gresham Police Department, were the lead detectives who directed the homicide investigation. Turnage Decl. ¶¶ 1–2; Foulke Decl. ¶¶ 1–2, ECF 31. Defendants and other investigators interviewed several people during the investigation. Defendant Turnage watched portions of each of the interviews through a closed-circuit television. Warren Decl. Ex. 8 ("Turnage Dep.") 9:8–10, ECF 34-1. Throughout their investigation, Defendants and the other investigators identified Plaintiff,

Andrew ("Drew") McMahon, Austin Brown, and Amber Wilson as suspects in the murder and robbery of the victim. Warren Decl. Ex. 6 at 1, ECF 34-1.

## I.        Plaintiff's Interview

At 3:14 a.m. on June 20, 2017, Defendant Foulke and Detective Jay Pentheny interviewed Plaintiff at the Gresham Police Department. Foulke Decl. Ex. 1 at 2, ECF 31-1. Plaintiff told Defendant Foulke and Detective Pentheny that Plaintiff had been at North Gresham Elementary school with "Drew" [McMahon] and "Austin" [Brown] on the night of the shooting. *Id.* at 3. Plaintiff said that Drew and Austin told Plaintiff while they were at the school that Drew and Austin planned to steal marijuana from someone who would soon meet them at the school. *Id.* at 3, 6, 10. Plaintiff knew that Drew had a gun. *Id.* at 7, 19. Plaintiff said that he told Austin and Drew that he did not want to be a part of the robbery, and he walked home from the school with Drew's girlfriend, Amber Wilson when he learned that the victim would soon arrive at the school. *Id.* at 4, 11. Plaintiff told the detectives that he heard a gunshot about ten or fifteen minutes later while he was walking home with Drew's girlfriend, and they ran the rest of the way to Plaintiff's house after hearing the gunshot. *Id.* at 5, 11.

Plaintiff said that after he got home, Drew and Austin came to his house, and Drew told Plaintiff that they had shot someone in the head. *Id.* at 17, 24. Plaintiff said that Drew and Austin had stolen marijuana from the person and had divided the stolen marijuana into two shares before Drew returned to Plaintiff's house. *Id.* at 9, 26. Plaintiff said that Drew's portion of the stolen marijuana was in the garage of Plaintiff's house, and Austin took his portion with him. *Id.* at 9–10. Plaintiff told the detectives that the gun that Drew had when they were at the school was in the crawlspace of Plaintiff's house, which investigators could access through a door in the

closet of the middle bedroom. *Id*. at 23–24. Plaintiff told the detectives that he had never touched the gun and that they would not find his fingerprints on it. *Id*. at 25.

During the interview, Plaintiff admitted to lying to the detectives about some of the things he had told them. *Id.* at 37. Plaintiff told them that he had lied about Amber and Drew having an argument before the shooting and had lied when he said that someone named Syrell had been at the school. *Id*. at 21, 30. Police located the gun in the crawlspace of Plaintiff's home, where Plaintiff said it would be. Turnage Decl. ¶ 2. Investigators found a bag of marijuana from the robbery in Plaintiff's garage. *Id*.

## II.    Witness Tyree O'Neil's Interview

Port of Portland Police Department Detective Sergeant Lance Hemsworth and Detective Tim Osorio conducted an interview of Tyree O'Neil that began at 3:12 a.m. on June 20, 2017, which occurred at the same time that Defendant Foulke and Detective Pentheny interviewed Plaintiff. Hemsworth Decl. ¶ 1, ECF 32; Hemsworth Decl. Ex. 1, ECF 32-1. Mr. O'Neil told Detective Hemsworth that he had been at a friend's house nearby when O'Neil and his friend Charles decided to go play basketball at the elementary school. Hemsworth Decl. Ex. 1 at 3. O'Neil and Charles left their friend Katlin's house, and Katlin stayed at her house. *Id*. At the elementary school, O'Neil saw three guys. One of them had no shoes on and had a beer in his hand. Another had a gun, and the third guy had a knife. *Id*. at 4. O'Neil said that the guys were talking about robbing someone for marijuana. *Id*.

According to O'Neil, the person with the gun showed O'Neil the gun, and O'Neil saw that the clip had four rounds in it. *Id*. The person with the gun cocked the gun, put the safety on, behaved strangely as he handled it, and pointed the gun at his own face. *Id*. O'Neil and his friend Charles played basketball for about fifteen minutes. *Id*. at 5. O'Neil said that a Hispanic guy and

one of the white guys were doing their own thing. *Id*. The guy with no shoes told O'Neil that

they were about to rob someone and told O'Neil not to be scared if O'Neil heard gunshots. *Id*.

  After playing basketball for a while, O'Neil and his friend Charles decided to leave

because of the three guys' statements and their possession of a gun and knife. *Id*. As O'Neil left,

he saw the three guys walk back to the area where they had been when O'Neil arrived at the

school. *Id*. O'Neil and Charles returned to Katlin's house and were going to start a fire in the

backyard. *Id*. From the backyard, they could see the school. *Id*. O'Neil saw a white car pull into

the school, heard a gunshot, and then he saw the car go into reverse and slam into the school. *Id*.

at 5, 7. No one go out of the car after it hit the school. *Id*. at 5, 7. O'Neil did not see the shooting

because a tree blocked his view, but he saw one person run away from the car heading north. *Id*.

at 5, 10. O'Neil went into Katlin's house after that and did not see anyone else run away from the

car. *Id*. at 10.

### III. Brown's Interview

  Gresham Police Department Detective Adam Wright led the interview of Austin Brown,

which, according to the interview transcript, began on July 20, 2017, at 4:50 a.m., more than a

month after the shooting. Wright Decl. ¶¶ 1–2 , ECF 33; Wright Decl. Ex. 1 at 2. The date on the

transcript of the Austin Brown interview appears to be incorrect. Defendant Turnage testified

that portions of Mr. Brown's interview occurred while Plaintiff's interview took place. Turnage

Dep. 9:8–10. The other witnesses were interviewed on June 20, 2017. During Brown's interview,

officers suggested to Brown that they had not yet located the gun and the marijuana stolen from

the victim. Wright Decl. Ex. 1 at 13–14, 16. Detective Wright's declaration does not clarify the

date. However, Multnomah County Deputy District Attorney Todd Jackson described Detective

Wright's interview of Brown in a probable cause affidavit that Mr. Jackson signed and filed with

the Multnomah County Circuit Court on June 21, 2017. Warren Decl. Ex. 2 at 2, ECF 34-1.

Brown was indicted in the same indictment as Plaintiff on June 28, 2017. Thus, is appears that

the Brown interview likely occurred on June 20, 2017, not July 20, 2017.

      During his interview, Brown initially said that Plaintiff and his friend "were probably

gonna lick" someone, which Brown explained meant to steal from the person. Wright Decl. Ex. 1

at 3. Brown said that he had been at the school with Plaintiff and Plaintiff's friend. *Id*. at 5.

Brown eventually told Detective Wright that robbery plan came together after Drew had called

Plaintiff and asked Plaintiff to tell Brown that Drew needed Brown's help to rob someone. *Id*. at

19. Brown told the detectives that when they went to the school to do the robbery, he saw some

kids at the school who were playing basketball. *Id*. at 15. He said that Plaintiff, Brown, and

Plaintiff's friend did not talk to the kids who were playing basketball. *Id*.

      Brown said that when he was sitting on benches, a car pulled up. Drew asked Brown to

take the gun, and he did. He and Plaintiff's friend approached the driver side of the car. *Id*. at 8.

At that time, Plaintiff was by the basketball hoops. *Id*. Brown said that Plaintiff's friend started

to argue with the driver, and Plaintiff's friend reached into the car to grab the bag of marijuana.

*Id*. at 12–13. Brown at first said that he heard a gunshot and ran. *Id*. at 12. Brown said that

Plaintiff and his friend ran, too, but Plaintiff took a route back to his house different from the

route that Brown and Plaintiff's friend took. *Id*. at 12–13. Brown said Plaintiff was already home

when Brown and Plaintiff's friend arrived. *Id*. at 13. Brown said that at some point, Brown and

Plaintiff swapped the jackets they were wearing. *Id*. at 17–18. Brown said that Plaintiff gave

Brown the black jacket that Plaintiff had been wearing to make it easier for Brown to hide if he

needed to, and Plaintiff took Brown's jacket, which was brighter. *Id*.

Later during the interview, Brown suggested that he had shot the victim. *Id*. at 19–20. Brown explained that Plaintiff's friend Drew had called Plaintiff and asked Plaintiff to ask Brown to help Drew rob a guy. *Id*. at 19. When the man in the car arrived, Drew grabbed the marijuana and the man in the car said, "we're not doing that." *Id*. Brown did not directly admit to shooting the man in the car, but Brown admitted that his fingerprints probably were on the gun and said that gunshot residue was probably on his hands. *Id*. at 20. Brown said that Drew had asked him to take the gun before the shooting and that Plaintiff was over at the basketball hoops with Amber, away from the car, when the shooting occurred. *Id*.

Brown told Detective Wright that the gun and the marijuana probably were in Plaintiff's garage because that was the only part of the house that they had been in before the police arrived. *Id*. at 13–14, 16. Brown said that Plaintiff used the garage as his bedroom. *Id*. at 16.

## IV.    Defendant Turnage's Probable Cause Affidavit

During the interviews of Plaintiff, Brown, and O'Neil, Defendant Turnage observed the interviews through a closed-circuit television recording system. Turnage Dep. 9:8–18. Defendant Turnage participated to some extent in Plaintiff's interview, although Defendant Foulke and Detective Pentheny conducted most of the interview. Foulke Decl. Ex. 1. Defendant Turnage prepared a Probable Cause Affidavit ("the affidavit") on June 20, 2020, in connection with Plaintiff's arrest. Warren Decl. Ex. 6. Plaintiff alleges that Defendant Turnage included several statements in the affidavit that Turnage knew to be false that were material to the probable cause determination. Compl. ¶¶ 9–10.

Defendant Turnage's affidavit said that Austin Brown had said that Brown and Plaintiff had participated in a robbery and planned to rob a drug dealer. Warren Decl. Ex. 6 at 1. It also asserted that Plaintiff told a witness, Tyree O'Neil, that Plaintiff knew about the robbery and that

they had planned to kill a drug dealer. *Id*. The affidavit stated that Brown said that Plaintiff stood back from the robbery and witnessed the homicide.[1] *Id*. It also said that O'Neill saw Plaintiff "participate in the homicide[.]" *Id*. at 3. The affidavit also stated that Plaintiff admitted to participating in the robbery with Brown, Andrew McMahon, and Amber Wilson. *Id*.

Defendants arrested Plaintiff for Felony Murder, Unlawful Use of a Weapon, and Robbery in the First Degree and confined him at the Gresham Police Department. Compl. ¶ 7, 12.

## V.    District Attorney Todd Jackson's Probable Cause Affidavit

On June 21, 2017, the day after Plaintiff's arrest, Multnomah County Deputy District Attorney Todd Jackson charged Plaintiff by information with robbery in the first degree and murder. Warren Decl. Ex. 1 at 1. Mr. Jackson filed a probable cause affidavit in the Multnomah County Circuit Court in support of the information at 1:09 p.m. Warren Decl. Ex. 2 at 1; Warren Decl. Ex. 1 at 1. Mr. Jackson's probable cause affidavit described the suspect and witness interviews in detail. Warren Decl. Ex. 2. Along with the facts provided by Plaintiff, Brown, and O'Neil, Jackson's affidavit relayed that a K-9 track had tracked a scent from the scene of the shooting to Plaintiff's house. *Id*. at 1. It also said that Brown was found running away from Plaintiff's house and that police officers found Plaintiff, McMahon, and Wilson at Plaintiff's house. *Id*. Mr. Jackson relayed that Wilson told Detective Pentheny that she had taken a handgun from her mother and brought it to Plaintiff's house. *Id*. She told Detective Pentheny that Plaintiff,

---

[1] The Court notes that the parties do not dispute that Defendant Turnage's probable cause affidavit says that Plaintiff witnessed the homicide. However, the Court cannot read the entirety of Defendant Turnage's handwritten description of what McMahon, Brown, and Wilson said on page 1 of the affidavit because a label was affixed over the information that is handwritten on the form. Warren Decl. Ex. 6 at 1. Because the parties do not dispute the contents of the affidavit, the Court accepts the parties' representation of its contents as true.

McMahon, and Brown planned to rob someone at the school with the gun. *Id*. Wilson said that she went to the school with McMahon, Plaintiff, and Brown. *Id*. She said that she was standing with Plaintiff near a light pole in the parking lot when they heard a gunshot. *Id*. at 2. Wilson said that she and Plaintiff ran back to Plaintiff's house. *Id*. Brown and McMahon arrived a short time later and told her that Brown had shot the victim. *Id*.

Mr. Jackson's probable cause affidavit also described an interview of O'Neil's friend Charles Jones. *Id*. Jones said that while he and O'Neil were at the school, three males approached them. *Id*. Jones said that one of the males told Jones and O'Neil that he was about to rob someone and showed Jones and O'Neil a gun. *Id*. Jones said that he asked the person with the gun if they were going to shoot the person that the males planned to rob, and the person with the gun said, "I don't know bro, I'm thinking about it." *Id*. Jones said that he and O'Neil left the school about fifteen minutes later and walked to Katlin Boevich's house. *Id*. From her backyard, Jones saw a white car pull into the school parking lot near the three guys, heard a gunshot, saw the car crash into the building, and saw one person run away from the car. *Id*.

Mr. Jackson's affidavit also said that investigators had obtained the surveillance video footage from the school. According to Mr. Jackson's affidavit, an investigator reviewed the video and saw that at about 11:17 p.m., a vehicle pulled into a parking space near dumpsters at the school, and two people approached the driver's door. *Id*. The investigator said that the video showed a vehicle begin to reverse and then crash into the school and showed two people run away from the car heading west. *Id*.

**VI.    Post-Arrest Criminal Proceedings**

About an hour after Mr. Jackson charged Plaintiff by information and filed his probable cause affidavit, the Multnomah County Circuit Court arraigned Plaintiff on the charges. Warren

Decl. Ex. 1 at 1–2. The transcript of that arraignment is not in the record. The Multnomah

County Circuit Court docket shows that Defendant Turnage's probable cause affidavit was filed

in the case two days later on June 23, 2017. Warren Decl. Ex. 1 at 1; Warren Decl. Ex. 6 at 1.

On June 28, 2017, eight days after his arrest, a grand jury indicted Plaintiff for Murder

with a Firearm and Robbery in the First Degree with a Firearm. Warren Decl. Ex. 3, ECF 34-1.

The Multnomah County Circuit Court arraigned Plaintiff on the indictment and issued a warrant

for Plaintiff's arrest on the same day. Warren Decl. Ex. 1 at 1; Warren Decl. Ex. 4, ECF 34-1.

The court released Plaintiff on his own recognizance on October 11, 2017. Warren Decl. Ex. 1 at

3. Plaintiff spent 113 days in pretrial detention before his release. Compl. ¶ 19. The state later

dismissed all charges against Plaintiff. Warren Decl. Ex. 5, ECF 34-1; Compl. ¶ 17. McMahon,

Wilson, and Brown were convicted of various charges related to the robbery and shooting.

Warren Decl. Ex. 9–11, ECF 34-1.

## STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the Court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the lack of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28

(9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The Court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Defendants moved for summary judgment on all of Plaintiff's claims. Because Plaintiff later dismissed all but his Fourth Amendment claim under section 1983, the Court addresses the parties' briefing only as it relates to that claim. Defendants argue that they are entitled to summary judgment on Plaintiff's section 1983 claim because Plaintiff did not suffer a violation of his Fourth Amendment rights and on the independent ground that they are entitled to qualified immunity.

Section 1983 provides that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

42 U.S.C. § 1983.

To establish a claim under § 1983, a plaintiff must both (1) prove the deprivation of a right secured by the federal Constitution or statutory law, and (2) establish that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

Defendants argue that they are entitled to summary judgment on Plaintiff's section 1983 claim because Plaintiff did not suffer a constitutional violation when Defendants arrested him.

## I.    Probable Cause

Plaintiff claims that he suffered a Fourth Amendment violation when Defendants (1) arrested him without probable cause, and (2) engaged in judicial deception by making knowingly false statements in a probable cause affidavit. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpack v. Alford*, 543 U.S. 146, 152 (2004). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment[.]" *Hill v. California*, 401 U.S. 797, 804 (1971). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. To determine whether probable cause existed, "a court will examine the facts leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quotation marks omitted) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Whether probable cause exists depends on the totality of the circumstances. *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

To determine whether Defendants had probable cause to arrest Plaintiff the Court must examine the facts known to Defendants when they arrested Plaintiff and decide whether those facts, viewed under a totality of the circumstances, created a sufficient probability that Plaintiff had committed the crimes for which Defendants arrested him. The facts known to Defendants when they arrested Plaintiff were that Plaintiff was present at the school before, during, and after the robbery and shooting. Investigators used a canine to track the suspects from the scene of the shooting to Plaintiff's garage, where they found Plaintiff and the stolen marijuana, and they located the gun used to shoot the victim in Plaintiff's house. Wilson and Brown told investigators that Plaintiff had participated in planning the robbery, and Brown told investigators that Plaintiff had given Brown his jacket to help Brown hide after the robbery.

Plaintiff knew that Drew McMahon had a gun and that McMahon planned to use it when McMahon and Brown robbed the drug dealer. O'Neil observed that the person with the gun unloaded it in the presence of the other two male suspects, and O'Neil saw that there were four rounds in the gun. Defendant Turnage testified that O'Neil had said within hours of the shooting that the person with the gun had a scar on their face, which Turnage believed to be Plaintiff. Eklund Decl. Ex. 1 at 24: 21–25:6, ECF 39. Plaintiff heard the conversation described by O'Neil in which McMahon and Brown explained that they might rob the drug dealer with the gun. O'Neil said that one of them told O'Neil that "if it comes down to it we're gonna kill him." Hemsworth Decl. Ex. 1 at 7. One of them told O'Neil not to be scared if O'Neil heard gunshots. O'Neil said that all three of the males remained at the school when O'Neil left.

Although Plaintiff claims to have left the school with Amber Wilson before the shooting occurred, Brown told investigators that Plaintiff was "over by the basketball hoops" when the robbery and shooting occurred, and Wilson said that Plaintiff was standing with her until the shot

was fired. Plaintiff's statement that he had started to walk home before the gunshot was inconsistent with Brown and Wilson's statements. Similarly, Plaintiff's statement that it took him ten to fifteen minutes to walk home was inconsistent with how long it should have taken him to walk the short distance from the school to his home. Plaintiff admitted to discussing the robbery and shooting with McMahon at his house after it happened. Plaintiff knew that the victim had been shot in the head. Plaintiff told investigators that the gun used in the shooting was hidden in the crawlspace of his house after the shooting and that some of the marijuana stolen during the robbery was in his room in the garage.

Investigators found the gun and marijuana in those places. Turnage Decl. ¶ 2. However, it is unclear from the record whether that occurred before or after Plaintiff's arrest. Defendant Turnage indicated that investigators had located the gun and the marijuana, along with a white jacket worn by Brown at the time of the murder before Defendant Turnage prepared his probable cause affidavit. Turnage Decl. ¶ 2. However, those facts are not included in Defendant Turnage's probable cause affidavit or the probable cause affidavit Mr. Jackson prepared the day after Plaintiff's arrest, so it is unclear whether the officers had recovered that physical evidence when they arrested Plaintiff. Warren Decl. Exs. 2, 6.

Defendants arrested Plaintiff because they determined that probable cause existed that Plaintiff had committed Felony Murder, Unlawful Use of a Weapon, and Robbery in the First Degree. Warren Decl. Ex. 6 at 1. In Oregon, a person commits robbery in the third degree if the person "in the course of committing or attempting to commit theft . . . uses or threatens the immediate use of physical force upon another person with the intent of . . . [p]reventing or overcoming resistance to the taking of the property or to retention thereof immediately after the taking." Or. Rev. Stat. § ("O.R.S.") 164.395(1)(a). Third-degree robbery becomes first-degree

robbery when the person commits third-degree robbery while armed with a deadly weapon or if the person uses or threatens to use a dangerous weapon. O.R.S. 164.415.

A person commits felony murder when the person, "acting either alone or with one or more persons . . . and in the course of and in furtherance of . . . committing or attempting to commit [first-degree robbery], or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants." O.R.S. 163.115(1)(b)(G). Oregon has an accomplice liability statute which provides that a person is criminally liable for the crime of another person if the person aids or abets or agrees or attempts to aid or abet the other person in planning or committing the crime with the intent to promote or facilitate the commission of the crime. O.R.S. 161.155.

Plaintiff argues that the officers did not have probable cause to believe that Plaintiff participated in the robbery and thus had no probable cause to believe that he had committed the other crimes stemming from the robbery. Pl. Opp'n 10. Plaintiff argues that it is undisputed that Plaintiff did not directly participate in the robbery. However, the probable cause analysis depends on the objective circumstances known to the officers at the time of Plaintiff's arrest, not what they now know to be true.

When Defendants arrested Plaintiff, they knew that Plaintiff had put Drew McMahon and Austin Brown in touch for the purpose of planning the robbery. The independent witness, O'Neil, put Plaintiff at the scene of the robbery and homicide minutes before it occurred. O'Neil told the investigators that the three of them—not just McMahon and Brown—had discussed their plan to rob someone with the gun. Hemsworth Decl. Ex. 1 at 4. When O'Neil left, he saw Brown, McMahon, and Plaintiff return to sit on a "brick thing" where they had been sitting when O'Neil had arrived. *Id*. at 4, 7. Wilson and Brown said that Plaintiff was at the scene of the robbery

during the robbery and shooting. O'Neil saw only one person running from the car after he heard the gunshot, but he did not have a good view and could not see the shooter from his friend's backyard. *Id*. at 10.

Despite denying that he was present during the robbery and shooting, Plaintiff knew the details of the crimes. He knew when and how the robbery occurred, that one of the suspects had shot the victim in the head, that a single shot had been fired, and that the other suspects had stolen marijuana from the victim and split it between them. He knew where the proceeds of the robbery and the gun were hidden in his house. Plaintiff's statements to Defendant Foulke also demonstrated that Plaintiff knew where to position himself to avoid appearing on the video footage captured by the school's security camera.[2] In addition, Plaintiff attempted to help Brown hide after the robbery by giving Brown his black jacket. Brown's white jacket was recovered from Plaintiff's bedroom.

Plaintiff claimed that when McMahon and Brown arrived at Plaintiff's home after the shooting, Plaintiff only spoke with McMahon, who told Plaintiff what had happened while Brown remained outside. But at another point during the interview, Plaintiff stated that "they were talking about we just . . . shot someone[.]" Foulke Decl. Ex. 1 at 17. Those inconsistent statements suggest that Plaintiff may not have been truthful to Defendant Foulke about not being present during the robbery and shooting.

---

[2] Defendants obtained footage from the school's security camera, but it is unclear from the record whether Defendants had obtained the footage before they made the probable cause determination. Detective Looney told Brown during Brown's interview that Looney had seen the video. Wright Decl. Ex. 1 at 3, 18. Turnage could not recall when he first reviewed the footage and did not refer to it in his probable cause affidavit. Warren Decl. Ex. 6; Eklund Decl. Ex. 1 at 7:6–20.

Under those facts, an objectively reasonable officer could conclude that there was a sufficient probability that Plaintiff had participated in the robbery. If not directly, then by agreeing or aiding or abetting in the planning of the crime with the intent that the other suspects would commit the crime and helping to conceal it thereafter. Plaintiff's denial of his involvement and Brown's and Wilson's statements that Plaintiff was near the basketball hoops or light pole when the robbery and shooting occurred did not eliminate the probability that Plaintiff was an accomplice to the robbery and murder under O.R.S. 161.155. Thus, probable cause existed to arrest Plaintiff for robbery in the first degree. Because Brown was armed with—and used—a gun to kill the victim while committing the robbery, probable cause also existed to arrest Plaintiff for felony murder as an accomplice to the first-degree robbery. As a result, Defendants did not violate Plaintiff's Fourth Amendment rights when they arrested Plaintiff. Because Plaintiff failed to establish a constitutional violation stemming from his arrest, Defendants are entitled to summary judgment on Plaintiff's section 1983 Fourth Amendment claim based on his arrest.

## II.    Judicial Deception Claim

Plaintiff also claims that Defendants violated the Fourth Amendment when Defendant Turnage filed a knowingly false probable cause affidavit. Deceiving a court to obtain a warrant violates the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1973). To establish a judicial deception claim under section 1983, Plaintiff must make a substantial showing that Defendants "deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) (citing *Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)); *Liston v. Cty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (citing *Hervey v. Estes*, 65 F.3d 784, 788–89 (9th Cir. 1995)). The materiality of alleged false statements or omissions to the probable cause

determination is a question of law. *KRL*, 384 F.3d at 1117 (citing *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002)).

Plaintiff's judicial deception claim is based on six statements in Defendant Turnage's probable cause affidavit. The Court addresses whether Plaintiff has made a substantial showing that Defendants acted deliberately or with reckless disregard for the truth in making each statement.

### a. Austin Brown's Statements

Plaintiff argues that Defendants acted deliberately by misrepresented the following facts in Defendant Turnage's probable cause affidavit: (1) Austin Brown stated to Defendant Turnage that Brown and Plaintiff participated in a robbery; (2) Austin Brown stated to Defendant Turnage that Brown and Plaintiff were going to rob a drug dealer; and (3) Austin Brown stated to Defendant Turnage that Plaintiff stood back from the robbery and witnessed the murder. Pl. Opp'n 6–7. Plaintiff argues that Brown did not make the three statements.

Brown said that they went to the school because Plaintiff and McMahon "were probably gonna lick him" and that Plaintiff was near the basketball hoops or a dumpster in the parking lot where Brown and McMahon robbed and shot the victim. Wright Decl. Ex. 1 at 3, 8, 20. Brown also said that he and Plaintiff switched jackets so that Brown could wear Plaintiff's black jacket, making it easier for Brown to hide after the robbery. *Id*. at 17–18. After the shooting, Brown said that he, McMahon, and Plaintiff all ran home, but Plaintiff "went a different way" and got back to his house before McMahon and Brown. *Id*. at 12–13. Brown was clear, however, that Plaintiff did not approach the victim's car, use the gun, or steal the marijuana.

Plaintiff argues that because none of the witnesses said Plaintiff was with Brown and McMahon outside the victim's car or said that Plaintiff took the victim's marijuana, Defendant

Turnage's statement that Plaintiff "participated" in the robbery was false. Turnage's probable cause affidavit says that Turnage "was told by . . . [Austin Brown that Brown] and Tyler participated in a robbery[.]" Warren Decl. Ex. 6 at 1. Plaintiff's participation was established by Brown's statements that Plaintiff helped plan it, knew it would happen, remained present when it happened, and helped conceal it by giving Brown his jacket.

Brown's purported statement that they would rob a drug dealer is also a fair characterization of what Brown told investigators. Brown did not specifically say that the victim was a drug dealer, but Brown did say that they went to the school to rob someone. The fact that the victim was a drug dealer came from Plaintiff himself. Similarly, Brown's purported statement that Plaintiff stood back from the robbery and witnessed the murder is an accurate characterization of Brown's statements to investigators. Brown said that the victim drove up to the side of the school, that the basketball hoops and benches were in the same area, and that Plaintiff was by the basketball hoops when the shooting occurred. *Id*. at 6, 20.

### b.  Plaintiff's Statements

Plaintiff argues that Defendant Turnage also deliberately misrepresented Plaintiff's statements in the probable cause affidavit. Plaintiff argues that Defendant Turnage's statement that Plaintiff admitted to participating in the robbery along with Brown, McMahon, and Amber Wilson was false. Pl. Opp'n 7. Plaintiff's argument that he did not admit to participating in the robbery again depends on whether the facts that Plaintiff described—that he went to the school knowing that a robbery would occur, discussed the plan to commit the robbery with McMahon and Brown at the school, knew where inside his house the gun used in the shooting and the stolen marijuana were—is an admission that he participated in the robbery even though he did not shoot the victim or take the victim's marijuana. Plaintiff did not admit that he participated in

the robbery. In fact, he denied his participation throughout his interview. Although one could conclude that he had participated in the robbery based on his knowledge of the details and the other suspects' statements, Plaintiff did not admit to participating in it. The probable cause affidavit purported to convey "statements made by [Plaintiff]," not the inferences that Defendant Turnage made based on Plaintiff's statements. Plaintiff's participation in the robbery was a conclusion that Defendant Turnage drew from Plaintiff's statements, not a statement made by Plaintiff. Defendant Turnage's statement that Plaintiff admitted to participating in the robbery was false.

### c.  Tyree O'Neil's Statements

Plaintiff also argues that Defendant Turnage made false statements in his probable cause affidavit that (1) O'Neil said he saw Plaintiff participate in the homicide, and (2) Plaintiff told O'Neil about their plan to rob a drug dealer and that they may kill the drug dealer. O'Neil did not say that he saw Plaintiff participate in the homicide. The excerpts of O'Neil's interview in the record establish only that someone—a person O'Neil could not see because a tree blocked his line of vision—shot the victim and ran from the scene. O'Neil could not identify the person who ran from the scene after the gunshot. None of the other witnesses identified Plaintiff as the shooter, either. In fact, Brown suggested during his interview that he had been the shooter. Although O'Neil's statements together with Brown's statements suggested that Plaintiff probably was present during the shooting, that is a conclusion that Defendant Turnage made, not a statement that O'Neil made.

The same is true for O'Neil's purported statement that Plaintiff told O'Neil that they planned to rob a drug dealer and might kill the drug dealer. The portions of the interviews in the record do not establish which of the three males made the statements that O'Neil described.

O'Neil described a person with no shoes on, a person with a knife, and a person with a gun. O'Neil described what Plaintiff, McMahon, and Brown looked like, but O'Neil's recounting of the events did not tie the statements about their plan to rob someone to a particular speaker. O'Neil heard one of the three males say that if it came down to it, they would kill the person, but the excerpts of O'Neil's interview in the record do not establish which of the three male suspects made that statement. As a result, Defendant Turnage's statement that O'Neil told investigators that Plaintiff told O'Neil that Plaintiff planned to rob and kill a drug dealer was false.

### d. Materiality

To determine whether a statement or omission in a probable cause affidavit is material, the Court accepts the facts as alleged by Plaintiff as true. *Liston*, 120 F.3d at 973. When analyzing materiality, the Court must determine "'whether the affidavit, once corrected and supplemented, would provide a . . . substantial basis for concluding that probable cause existed.'" *Id.* (quoting *Stanert*, 762 F.2d at 782). Thus, the Court must analyze whether probable cause existed despite the inaccurate statements in Defendant Turnage's affidavit.

Defendant Turnage's probable cause affidavit was not material to the finding of probable cause. Based on the record, the only probable cause affidavit that appears to have been before the Multnomah County Circuit Court when it arraigned Plaintiff on June 21, 2017, was Multnomah County Deputy District Attorney Jackson's affidavit.[3] Warren Decl. Ex. 2. The Multnomah County Circuit Court docket shows that Mr. Jackson filed his probable cause affidavit on June 21, 2017, at 1:09 p.m., before Plaintiff's arraignment later that day at 2:15 p.m. Warren Decl. Ex.

---

[3] Plaintiff's Fourth Amendment claims are based solely on the claim that Defendant Turnage's affidavit did not establish probable cause that Plaintiff had committed robbery and murder. As a result, the Court does not analyze the legal sufficiency of Deputy District Attorney Jackson's probable cause affidavit.

1 at 1; Warren Decl. Ex. 2 at 1. Nothing in the record establishes that the judge who arraigned Plaintiff saw or considered Defendant Turnage's probable cause affidavit to determine whether probable cause existed to hold Plaintiff on the robbery and murder charges.

Defendant Turnage's affidavit appears to have been filed with the court two days after Plaintiff's initial arraignment. Warren Decl. Ex. 1 at 1; Warren Decl. Ex. 6 at 1. The state court docket shows no activity in the criminal case between June 23, 2017, when Defendant Turnage's affidavit was filed, and June 28, 2017, when the grand jury returned an indictment charging Plaintiff with robbery and murder. Warren Decl. Ex. 1 at 1; Warren Decl. Ex. 6 at 1.

Plaintiff argues that because Defendant Turnage's affidavit was filed in Plaintiff's criminal case, it was material to the probable cause determination. Plaintiff also argues that the effect of Defendant Turnage's affidavit on the probable cause determination is a question of disputed fact that a jury should decide. But Plaintiff points to nothing in the record that establishes that the judge who arraigned Plaintiff on June 21, 2017, saw Defendant Turnage's affidavit or considered it in determining whether probable cause existed. The undisputed evidence in the record shows that it was filed two days after the judge make the probable cause determination at Plaintiff's arraignment. Plaintiff does not argue that the Multnomah County Circuit Court docket inaccurately reflects the date that the state filed Defendant Turnage's affidavit in Plaintiff's criminal case. Plaintiff has not produced a transcript of the June 21, 2017, arraignment from which this Court could determine whether the judge who arraigned Plaintiff considered or relied on Defendant Turnage's affidavit. With no evidence in the record to the contrary, there is no genuine dispute of fact that the judge who arraigned Plaintiff did not rely on Defendant Turnage's affidavit to make the probable cause determination. As a result, Defendant Turnage's probable cause affidavit was not material to the judge's probable cause determination,

and Defendants did not violate Plaintiff's Fourth Amendment rights by engaging in judicial

deception. Defendants are thus entitled to summary judgment on Plaintiff's section 1983 judicial

deception claim.[4]

### III.    Qualified Immunity

Defendants move for summary judgment on the additional basis that they are entitled to

qualified immunity from Plaintiff's claims. Because the Court finds that Defendants did not

violate any constitutional right, the Court need not address this question.

### CONCLUSION

The Court GRANTS Defendants' motion for summary judgment [29]. This action is

dismissed with prejudice.

IT IS SO ORDERED.

DATED:____November 20, 2020____.


_Marco Hernandez_
MARCO A. HERNÁNDEZ
United States District Judge

---

[4] Plaintiff also argues that "the most likely explanation for Plaintiff's continued detention post-indictment is that Defendant Turnage made the same factual misrepresentations before the grand jury." Pl. Opp'n 9. There is no evidence in the record to support such a claim, so that argument does not preclude summary judgment for Defendants.